Filed 4/23/21  Q.P. v. Superior Court CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Q.P. et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Real Party in Interest. | F082291<br><br>(Super. Ct. No. JD141010-00)<br><br><br>**OPINION** |

-ooOoo-

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Marcos R. Camacho, Judge.

Michelle R. Trujillo for Petitioners.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Real Party in Interest.

Pam Singh, Public Defender, and Robin M. Walters, Deputy Public Defender, for Minor.

-ooOoo-

---

[*]     Before Detjen, Acting P.J., Meehan, J. and Snauffer, J.

After the juvenile court terminated parental rights in November 2020, the Kern County Department of Human Services (department) notified petitioners Q.P. and C.P. of its intent to remove now 11-month-old Baby Boy H. (the baby) from them to place him with a maternal cousin and her husband in Louisiana. Petitioners objected to the removal and following a hearing, the juvenile court designated petitioners the baby's prospective adoptive parents and denied their objection to the removal, finding it was in the baby's best interest. Petitioners seek extraordinary writ relief, arguing there was insufficient evidence to support the court's removal order. (Welf. & Inst. Code, § 366.28.)[1] We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

The baby was born prematurely in May 2020, at 34 weeks gestation and tested positive for opiates. His mother tested positive for methamphetamine and opiates. She admitted using heroin just before going to the hospital and tested positive for amphetamine and opiates during prenatal visits in March and April 2020. The baby was in respiratory distress and suffering from withdrawal symptoms. He was airlifted to another facility with a higher level of care, admitted to the neonatal intensive care unit and treated with morphine and a gavage for feedings.

The mother has a history of drug abuse dating back to 2016. She and the baby's father lost custody of two other children because of her drug use. Reunification services were provided but terminated after she failed to comply. Her parental rights were terminated, and the children were adopted by paternal relatives in April 2019. The father also has a son and daughter who were 10 and eight years old, respectively, when these proceedings were initiated, both of whom live with their mother in Arizona.

The mother was discharged from the hospital on May 8, 2020. An emergency response social worker attempted to locate the parents over the next several weeks at all known addresses without success. On May 22, 2020, the social worker obtained a

---

[1] Statutory references are to the Welfare and Institutions Code.

protective custody warrant for the baby. The baby was discharged from the hospital on May 25, 2020, and placed in an emergency placement. On June 12, 2020, he was placed with petitioners.

On June 11, 2020, the department mailed placement information to relatives, including Kristin C. (Kristin), a maternal cousin who lived in Louisiana.

On June 19, 2020, the juvenile court sustained allegations the baby was a minor described under section 300 and set the matter for disposition. The parents were represented by counsel but did not appear at this or any subsequent hearings.

In its report for the dispositional hearing, the department recommended the juvenile court deny the parents reunification services. The department reported no relatives had applied for placement and the baby was bonded to petitioners, who wanted to adopt him.

On July 10, 2020, the juvenile court denied the parents reunification services and set a section 366.26 hearing for November 9, 2020.

On September 25, 2020, the juvenile court authorized a home evaluation of Kristin's home in Louisiana through the Interstate Compact for the Placement of Children (ICPC).

The department recommended the juvenile court terminate parental rights and free the baby to be adopted by petitioners. The social worker opined they appeared to have bonded with him in a "primary relationship that should continue." The baby appeared "happy, calm, and easily comforted by his prospective adoptive parents." The petitioners had formed a parental relationship with the baby and the baby depended on them for his daily physical and emotional needs. They demonstrated they were capable and committed to caring for the baby and had a nurturing and loving relationship with him.

On November 9, 2020, the juvenile court terminated parental rights.

On January 14, 2021, petitioners were served with notice of the department's intent to remove the baby. Kristin's home was approved for placement on December 23,

2020, and the department believed it was in the baby's best interest to be placed with her. Kristin expressed interest and applied for placement shortly after the baby was placed into protective custody. Her application was one of three submitted for processing, but the department did not timely process them. Meanwhile, Kristin made multiple efforts to establish and maintain a relationship with the baby. She requested pictures of him and visitation. She traveled from Louisiana to California on October 15, and December 21, 2020, to visit him in person. In addition, she maintained regular visitation with him through video chats since October 2020. Video chats increased to weekly after her home was approved in December. She and other biological relatives advocated diligently for him to be placed with her since the beginning of the case.

Because of the baby's young age, the department did not believe it would be detrimental to remove the baby from petitioners who were also firmly committed to adopting the baby. The benefits of being linked to family of origin, maintaining regular ongoing familial relationships, including sibling relationships, and being raised within his biological family outweighed the benefits of maintaining the placement in his current pre-adoptive home.

On January 19, 2021, petitioners filed an objection to the removal. In a four-page letter attached with pictures, C.P. described the loving relationship she, her husband, Q.P., and their children had developed with the baby and how well the baby was doing in their care. They gave him a name, to which he responded and which his biological family adopted. On January 12, 2021, the social worker informed her the parents had not appealed the termination of their parental rights and she believed they were free to adopt the baby. However, later that day, the social worker called to say the department was seeking to place the baby with Kristin and that they would have to begin weekly video visits.

C.P. disagreed that it would be in the baby's best interest to be placed with Kristin, who had had less than three hours of contact with him. She and her husband maintained

4.

contact with the baby's paternal biological family and offered their information to the maternal family.

C.P. also disagreed that breaking the emotional and psychological bond they created with the baby would not be detrimental to him. She believed he would feel abandoned by her. As a crisis intervention specialist at a mental health urgent care, she believed babies grieve when their relationships are disrupted, and the sadness adversely affected their development. She explained, " 'From the science of early childhood development, we know that early relationships and attachments to a primary caregiver are the most consistent and enduring influence on young children's social and emotional development. Infants and toddlers who can develop secure attachments are more mature and positive in their interactions with adults and peers than children who lack secure attachments. Those who do not have an opportunity to form a secure attachment with a trusted adult suffer grave consequences. Their development can deteriorate, resulting in delays in cognition and learning, relationship dysfunction, difficulty expressing emotions, and future mental health disorders.' "

Still, C.P. stated, they were paying the price of the department's neglect, referring to its delay in timely processing the ICPC and not approving Kristin for placement until December 23, 2020, after the termination of parental rights. She asserted that the social worker and court could no longer consider any of the biological relatives for preferential consideration after parental rights are terminated.

The juvenile court set a hearing on petitioners' objection to removal to be heard on January 25, 2021.

On January 22, 2021, Kristin filed a three-page letter in which she described the vast network of family (siblings, aunts, uncles, cousins, and grandparents) who were invested in keeping the baby in the family. She described herself and her husband of 17 and a half years as employed, financially stable and involved in their church. They had two children, a 14- and 10-year-old. They were aware of the baby's health issues related

to his exposure in utero to drugs and prepared to maintain his medical regimen. She described their family as "huge," consisting of maternal and paternal relatives who live in Bakersfield, North Carolina and Louisiana. The family gathers frequently for holidays, birthdays, barbeques and sporting events. The baby would be abundantly loved and cared for. He was already "so loved" and had a room prepared and waiting for him filled with everything he could possibly need.

Kristin also explained that the family had a personal experience with adoption. Her mother, aunt and three uncles were adopted. As a result, they struggled with the disconnect, curiosity, loss of identity, low self-esteem, and feelings of abandonment and rejection by their biological parents. She stated, "Every adopted child has consequently struggled with bonding, attachment disorders, jail time, theft, lying, jealousy, substance abuse and violence. Even after locating their biological parents as adults, the damage is irreversible." She and her family wanted the baby to feel connected, to have access to his health history, contact with his siblings and the pleasure of having his relatives present.

Kristin also felt she had been failed by the county, who had her application from July 3, 2020, to the end of September. She attached a timeline of actions taken to apply for placement, beginning with the initial letter sent by the department in June 2020. She also attached pictures of herself with the baby and a picture of her family.

In a supplemental report filed for the hearing, the department acknowledged its delay in processing Kristin's application for placement. She expressed interest on June 17, 2020, and applied prior to the dispositional hearing. However, that information was not presented to the court and the case was ordered to adoption. In addition, the social worker assigned the case did not process the ICPC application until after the hearing. On November 11, 2020, the baby was freed for adoption and the caregivers were identified as prospective adoptive parents.

The baby was doing well in his placement where he had been since June 2020. However, due to his young age, the agency believed that he could and would successfully

6.

attach to Kristin. Studies had shown, according to the department, that age at the time of placement was "not always related to attachment quality. In one study of infants placed at birth to 24 months of age, healthy attachment was apparent for relatively late-placed babies, as well as early placed babies. The research showed that despite disruption in care during the first year and a half of life, babies were capable of developing new relationships to new caregivers. In another study, infants who experienced placement disruptions prior to 12 months of age continued to form secure attachments."

On January 25, 2021, the department submitted the matter on its notice of intent to remove and its report. It did not present any further evidence. Minor's counsel submitted on the department's recommendation. The juvenile court designated petitioners as the prospective adoptive parents.

Petitioners called Dr. Charree Kashwer, an expert in child development and attachment bonding, who explained the stages of infant development. Bonding and attachment begin at birth. During the first few months, referred to as the indiscriminate attachment phase, the child is not attaching in any significant way. During the next few months until approximately six months, the attachment in the making phase, the child will begin to respond to certain voices and perhaps show a bit of preference for a specific caregiver. Dr. Kashwer believed that was significant in the baby's case because he would have developed a "clear-cut attachment" with a primary caregiver that he regarded as his secure base. That would be the person he would turn to for comfort and who he would want to take care of him. By seven or eight months, a child will experience separation anxiety and protest when the caregiver is absent. That then brings on stranger anxiety. "Those are all healthy developmental stages in the development of a secure attachment, but this particular age becomes very critical when we're talking about moving children." Once a child attaches, the child will begin to make multiple attachments. Dr. Kashwer believed the best time to move a child was before the age of six months. The most potentially traumatic time to move a child is from six to 24 months.

Asked how the baby's attachment may have been affected by being in the hospital and an emergency placement within the first five weeks of his life, Dr. Kashwer said it would make him more fragile. "We do know that children can form—can be re-placed and can form attachments again; however, every change that a child experiences is a trauma, and the more of those that are stacked up against the child, especially in the early years, the greater the likelihood of long-term impact on the child. [¶] So it's concerning that, you know, he's already had significant trauma in the first five weeks of his life with multiple caregivers. I believe there might have been in utero exposure to substances, so even prenatal care and prenatal attachment … is generally not established."

Dr. Kashwer opined the baby would experience the abrupt removal from petitioners as the death of a parent because petitioners had become his psychological parents. The in-person visits and video visits with relatives did not create an attachment between them and the baby. Attachment is formed by being emotionally responsive and attuned to the baby's needs particularly when he is in stress.

Dr. Kashwer testified the baby would bond with Kristin and her family but she could not predict whether it would be a healthy bond. Studies showed that children in that age range coming from inferior environments and placed in a superior environment bond to a new caretaker. However, there were no studies on children removed from a healthy environment. In any event, the child will suffer a trauma. Abrupt separations cause the child to develop a negative internal working model that they are not valuable or safe, that others cannot be trusted, and that the world is unpredictable. Potential long-term attachment difficulties can ensue, reactive attachment disorder being the extreme. She was not saying that the baby would develop a reactive attachment disorder. She said there was no way to weigh the potential benefit to the baby of living with family over the risk of removing him from petitioners. It was never in a child's best interest to remove him or her from a loving, supportive placement unless absolutely necessary.

Dr. Kashwer testified the responsiveness and consistency of the caregiver were also factors in determining the quality of a child's attachment. She could not give a definitive opinion as to whether the baby could form a healthy attachment with Kristin and her family.

The juvenile court inquired whether it would be beneficial for a child to start developing connections with biological relatives at the eighth or ninth month. Dr. Kashwer said that would be an ideal period. "The child's ability to expand and sort of bring more people into his attachment circle is enhanced at that period." She was not aware of any studies where the quality of the caretaker and relatives was the same and the connection with the biological family was helpful to the child.

In Dr. Kashwer's experience, adult clients did not describe being adopted by unrelated caregivers as a traumatic experience. They may long to know their biological family, but they were more negatively affected by the "bouncing around" and losses and changes of caregivers.

C.P. testified she had three other children in the home, her 14-year-old biological daughter and two adopted children aged four and two. She believed in maintaining ties with their biological families and was actively doing so. She had contact with the baby's paternal grandmother and paternal aunt and would maintain those connections. The baby was excited to see her husband when he came home from work. He jumped up and down in his bouncer. He screeched when the other children were around him because he was excited to be around them.

Q.P. testified he worked as an avionics technician on F-18's and came home dirty. He had to sneak into the house and shower before the baby saw him because otherwise, he screamed for him, wanting to be picked up. He also believed it was important to maintain ties with the baby's biological family.

Kristin testified she visited the baby in October and December 2020. Each time they spent an hour together. She was concerned he would be afraid of her, but she

9.

quickly had him laughing.  He was relaxed when she held him and fed him.  Between October and December, she had video visits.  She and the maternal side of the family were close, and she would maintain those ties for the baby.  She was also in contact with the paternal aunt who adopted the baby's siblings.

During argument, the juvenile court and counsel agreed the only issue before the court was whether removing the baby from the prospective adoptive parents to place him with Kristin and her family was in the baby's best interest.[2]  Petitioners' attorney argued it was not in the baby's best interest to remove him from the only parents he knew because it would traumatize him in ways no one could predict.  In addition, petitioners intended to maintain his family ties.  Minor's counsel argued the baby should be placed with Kristin because in the long run his interests were best served by being raised with biological relatives.  The fact that he bonded with petitioners indicated he could bond again.  And even though a child suffered trauma every time the child was moved, there was no evidence the trauma could not be overcome.  Additionally, although many prospective adoptive parents stated they would maintain the child's familial relationships, they did not in most cases.  Minor's counsel was dubious that petitioners would succeed in maintaining the baby's familial bonds.  County counsel argued there was no evidence that the baby could not form a healthy bond with Kristin and her family.  In the long term it was in the baby's best interest to be placed with relatives.

The juvenile court acknowledged both petitioners and Kristin offered the baby excellent homes.  However, the baby was starting to form multiple connections with other people and the court believed those people should be his biological family.  The court believed petitioners wanted to maintain those biological connections for the baby but that would become more difficult over time as they cared for their own family.  "Looking at the totality of the circumstances long term for this child; what's in the best

---

[2]    They also acknowledged the relative placement preference under section 361.3 no longer applied after the termination of parental rights. (See *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1031.)

interest of this child, and even though he's gonna suffer some trauma, at this point in the stage whether that trauma can be overcome by him having a substantial connection with his … biological family.  And I think that is the one thing that sort of tips the scales toward the child being placed with … [Kristin]."

The juvenile court found removal was in the baby's best interest.  Petitioners' attorney asked the court to stay the removal so she could file a writ.  The court denied her request.

The following day, petitioners' attorney requested an ex parte hearing to enforce the automatic stay where the child is being moved out of state.  (Code Civ. Proc., § 917.7.)  The court ordered that the baby not be removed from the state for seven calendar days.  At oral argument, counsel stated the baby was immediately placed with Kristin who remained in California with the baby until the stay expired.[3]

## DISCUSSION

" 'The purpose of the California dependency system is to provide maximum safety and protection for dependent children, and to ensure their physical and emotional well-being.  (§ 300.2.)  The Legislature has declared it is state policy to facilitate the proper placement of every child in residential care in a placement that is in the best interests of the child.'  [Citation.]  [¶]  In furtherance of this policy, the Legislature enacted section 366.26(n) 'to strengthen the juvenile court's oversight and to protect the stability of children after parental rights are terminated ….'  [Citation]  The statute addresses a legislative concern that an unjustified agency action in removing a child from a long-term caregiver might not be in the child's best interest."  (*In re L.M.* (2019) 39 Cal.App.5th 898, 910.)

Once parental rights are terminated and the child is referred for adoptive placement, the social services agency is responsible for the child and is normally entitled

---

**3**     Where the baby is presently placed was not a consideration in our review of the case.

11.

to the "exclusive care and control of the child at all times" until an adoption petition is granted. (§ 366.26, subd. (j).) The social services agency is responsible for placement decisions, although the juvenile court may review those decisions for abuse of discretion. (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1381–1382.)

The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interest. (§ 366.26, subd. (n); *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.) A prospective adoptive parent may object to the child's removal from the home. (§ 366.26, subd. (n)(3)(A).) "If a prospective adoptive parent objects to the child's removal from the home, the [social services a]gency must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests." (*T.W. v. Superior Court*, at p. 45.) At the hearing on the objection, the court shall determine whether the caretaker has met the threshold criteria to be designated as a prospective adoptive parent and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest. (§ 366.26, subd. (n)(3)(B).)

"A juvenile court's decision to authorize a change in the minor's placement is reviewed for abuse of discretion. [Citation.] But we must also review the juvenile court's finding that the change is in the minor's best interests to determine whether there is substantial evidence in the record to support it." (*In re M.M.* (2015) 235 Cal.App.4th 54, 64.) "Under the substantial evidence standard of review, an appellate court reviews the record in the light most favorable to the trial court's findings. [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] We may not reweigh or express an independent judgment on the evidence." (*In re L.M.*, *supra*, 39 Cal.App.5th at pp. 913–914.) Nor will we disturb a juvenile court's custody determination unless it

12.

exceeds the limits of legal discretion. " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Here, petitioners argue the department offered no evidence to show that removing the baby from their custody would serve his best interest. The only evidence presented, they claim, was that the department had not timely processed the ICPC application and that Kristin visited the baby twice in person and by video several times. There was no reason to favor Kristin as a relative placement option, they point out, because parental rights had been terminated.

Contrary to petitioner's claim, the department did present evidence removing the baby to place him with Kristin was in his best interest. First, it established that the baby would form a healthy attachment to her. In its report for the removal hearing, the department offered the conclusions of three studies which collectively suggest that a child removed up to 24 months of age can still develop healthy attachments to a new caregiver. Petitioners take issue with the "vague" and conclusory nature of the studies as presented by the department.[4] However, they did not refute the department's representation of the findings and their own expert, Dr. Kashwer, conceded the baby would bond with Kristin. Further, Dr. Kashwer could not say the baby would not develop a healthy bond to Kristin and her family since there were no bonding studies assessing children removed from one healthy environment to be placed in another. The only thing Dr. Kashwer could say with certainty was that the baby would suffer trauma if removed from petitioners.

Further, at oral argument, counsel for the department argued removal and placement with Kristin was in the baby's best interest because it allowed him to be raised within his family of origin. Petitioners do not refute the importance of family to the

---

[4]     The department briefly summarized its interpretation of the studies' conclusions. It did not attach a copy of the studies to its report, cite to the studies by title, author(s) or publication or quote any sections of the studies.

13.

baby's well-being. They actively maintained familial relationships for their two adopted children and planned to do the same for the baby.

Although the evidence supports the juvenile court's ruling, the decision to move a child between loving homes is a very difficult one. The juvenile court in this case had to decide whether the long-term benefit of placing the baby in a loving home with relatives outweighed the trauma he would experience by being separated from his "psychological parents" to whom he was solidly attached. Case law, however, is very clear that juvenile courts have broad discretion in determining what serves the child's best interest and appellate courts have affirmed opposite findings even in similar cases. Two cases, *In re M.H.* (2018) 21 Cal.App.5th 1296 and *In re L.M.*, *supra*, 39 Cal.App.5th 898, are illustrative on this point.

In *In re M.H.*, *supra*, 21 Cal.App.5th 1296, the juvenile court was asked to decide whether to leave a 14-month-old child in a concurrent foster home where he was placed at birth and thriving with caretakers who wanted to adopt him or remove him and place him with his maternal great-aunt who also offered a loving home. (*Id*. at pp. 1300–1301.) The juvenile court concluded it was in the child's best interest to remain in the concurrent foster home. (*Id*. at pp. 1305–1306.) The appellate court affirmed. In doing so, the appellate court recognized the juvenile court "was faced with two good options" and acknowledged they must give deference to the juvenile court's placement decision. (*Ibid*.) The court stated, "[T]he court was fully aware of the difficulty of the choice and, with the parties before it, was best able to make the hard call of which placement, under the circumstances as they then existed, was in the minor's best interest. The uncontroverted evidence was that M.H. was thriving in his current placement. Faced with the successful bonding of the minor with the de facto parents, and the uncertainty of how the minor would respond to removal from the parental figures he had known since birth, we cannot say that the court abused its discretion in concluding that his continued placement was in his best interest." (*Id*. at p. 1306.)

14.

The court in *In re L.M.* was asked to remove the minor from her foster home, which had provided "excellent care for essentially her entire 10-month life," and place her in a home where her sister had previously been placed. (*In re L.M.*, *supra*, 39 Cal.App.5th at p. 900.) The juvenile court conducted an extensive evidentiary hearing, at which contrasting evidence was presented regarding the detriment to the minor from severing a secure attachment with the foster parents versus the " 'absolute[ ]' " benefit from being raised with her sibling. (*Id.* at pp. 904–908, 914.) Following the hearing, it concluded placing the minor in a home with her sister would be in the minor's best interest. (*Id.* at p. 908.) "The tipping point was the relationship between L.M. and [her sister], who 'hit it off immediately' and 'simply love each other.' An experienced social worker testified that these girls 'are so attached to each other…. It's nothing like I've ever seen.' " (*Id.* at p. 900.) The court of appeal affirmed. It acknowledged although the juvenile court's decision was the opposite of that made in *In re M.H.*, the same "standard of review compels affirmance." (*Id.* at p. 915.) "We understand, as the Court of Appeal in *In re M.H.*, that the juvenile court was in the best position to make the difficult decision of which placement, between two excellent options, was in L.M.'s best interest. Substantial evidence supports the court's finding that removal here was in L.M.'s best interest, and in so ruling the court did not abuse its discretion." (*Ibid.*)

The juvenile court in this case placed great weight on the long-term value to the baby of being raised with his biological family and decided it was in his best interest to be removed from petitioners and placed with Kristin. As it was for the juvenile court in *In re L.M.*, the "tipping point" in this case was the prospect of a close familial relationship for the baby with his biological family. We acknowledge that *In re L.M.* is distinguishable in that a close relationship did not exist between the baby and Kristin as it did between the sisters. In that regard the evidence favoring placing the baby with biological relatives was less compelling than it was in *In re L.M.* Nevertheless, the

15.

juvenile court must be able to consider all factors that bear upon the child's well-being, not just in the present but in the future as well.  Kristin and her family offered the baby the opportunity to develop close and enduring family connections.  Further, although petitioners vowed to maintain the baby's familial relationships, they could not realistically create the strong connections from outside the family network that the baby would develop from the day-to-day interaction with the family.

We conclude substantial evidence supports the juvenile court's finding that removal was in the baby's best interest and that it did not abuse its discretion in removing the baby from petitioners' custody.

## DISPOSITION

The petition for extraordinary writ is denied.  Our decision is immediately final as to this court.  (Cal. Rules of Court, rules 8.452(i) & 8.490(b)(2)(A).)